728 A.2d 297 (1999)
321 N.J. Super. 133
Michael HEITZMAN, Plaintiff-Appellant,
v.
MONMOUTH COUNTY, Monmouth County Reclamation Center, Kyle Matthew Dodig, Richard Throckmorton, John L. Gray and Charles Yopp, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 1999.
Decided May 11, 1999.
*299 Mitchell Kastner, Highland Park, for plaintiff-appellant (Mark S. Winter, Parsippany, on the brief).
Robert J. Hrebek, Assistant County Counsel, for defendants-respondents (Malcolm V. Carton, Monmouth County Counsel, attorney and on the brief).
Before Judges HAVEY, SKILLMAN and LESEMANN.
*298 The opinion of the court was delivered by SKILLMAN, J.A.D.
Plaintiff appeals from a summary judgment which dismissed both counts of his complaint alleging violations of the Law Against Discrimination (LAD). N.J.S.A. 10:5-1 to -42. The first count alleged that plaintiff was subjected to a hostile work environment and ultimately demoted because of his sensitivity to second-hand smoke, which plaintiff contends is a "handicap" within the intent of the LAD. The second count alleged that plaintiff was subjected to a hostile work environment as a result of a series of anti-Semitic comments.
In March 1992, plaintiff began his employment with defendant Monmouth County at the County's reclamation center as a weighmaster. He alleges that before he began his employment, he told his supervisors that he was "extremely sensitive" to smoke. Plaintiff alleges that he satisfactorily completed a one month trial period, but shortly thereafter he began experiencing difficulty with the smoke he was forced to encounter on the job. He protested to his supervisor, defendant Kyle Dodig, who attempted to address the problem. Dodig and plaintiff's other supervisors posted "no smoking" signs and arranged a schedule under which two of the four booths where weighmasters worked were designated "non smoking." Although plaintiff was assigned to those booths on a regular basis, he claims there were frequent occasions when other employees scheduled to work with him did not appear and substitutes were provided, many of whom smoked in the designated non-smoking weighmaster booths. In addition, many employees ignored the "no smoking" signs, and plaintiff alleges his superiors made no sustained effort to enforce them.
Plaintiff also alleges that a series of anti-Semitic comments at the reclamation center created a hostile work environment. Plaintiff *300 states that although he is "not a practicing Jew," his mother was born to "parents who practice the Jewish religion" and that, accordingly, under strict Judaic law he is Jewish. He also alleges that his last name and alleged "Semitic physical appearance" led other employees at the reclamation center to assume he was Jewish, and that he was "the subject of many anti-Semitic actions such as the use of anti-Semitic slurs."
While plaintiff allegedly experienced difficulty with the effects of smoking by coworkers and anti-Semitic comments, his job performance produced a number of adverse reports and negative evaluations by his superiors. Between October 1992 and April 1993 he was disciplined four times: for closing his scale early, for arguing with another employee over smoking, and on two occasions for making calculation errors. In May 1993, a number of coworkers complained about his failure to work hard enough and having offensive body odor. In August 1993, when plaintiff complained that he had been distracted by adverse actions of a coworker, he failed to collect a payment from a customer. As a result he was told the next day that he was terminated as a weighmaster and would be reassigned as a laborer. He said he accepted the transfer "voluntarily" because he thought he had no alternative. He also says he was promised the transfer would not involve a salary reduction but in fact his salary was reduced. He grieved that issue through his union but was unsuccessful.
The trial court concluded that sensitivity to second-hand cigarette smoke does not constitute a handicap under the LAD. In addition, the court concluded that plaintiff had not presented satisfactory evidence that he is hypersensitive to cigarette smoke. The court also rejected plaintiff's claim that he had been subject to a hostile work environment because of a pattern of anti-Semitic comments, concluding that plaintiff could not maintain this claim because he is not Jewish. Moreover, the court concluded that even if plaintiff had been Jewish, the comments were not sufficiently severe or pervasive to support a hostile work environment claim.
We conclude that an alleged hypersensitivity to second-hand cigarette smoke, which is not related to any recognized medical condition, does not constitute a handicap within the intent of the LAD. We also conclude that the alleged anti-Semitic comments made to plaintiff or in plaintiff's presence were not sufficiently severe or pervasive to create a discriminatory hostile work environment. Accordingly, we affirm the summary judgment dismissing plaintiff's complaint.
I
The LAD defines "handicapped" to mean suffering from a physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness ... or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.

[N.J.S.A. 10:5-5(q).]
In Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 594, 538 A.2d 794 (1988), the Court concluded, on the basis of expert medical testimony, that "an alcoholic might suffer from either a `physical disability [or] infirmity... which is caused by illness,' or from a `mental [or] psychological ... disability resulting from psychological, physiological or neurological conditions which ... is demonstrable, medically or psychologically, by accepted clinical or, laboratory diagnostic techniques,' N.J.S.A. 10:5-5(q), or both," and thus "alcoholism is a handicap within the [LAD]." However, the Court also concluded that Clowes had failed to present adequate medical proof that he was an alcoholic:
Conspicuously absent from the record is any testimony from a treating or examining physician that Clowes had been diagnosed as an alcoholic. Given the complexity of the many diagnostic procedures involved, expert medical testimony is required to establish the fact of the employee's alcoholism....
The only evidence in the record regarding Clowes's alleged alcoholism is his own *301 assertion that he was an alcoholic, and a partial medical record from his hospitalization at Princeton House.... Clowes's admission that he was an alcoholic, along with his testimony regarding his drinking habits, is insufficient to prove that he suffered from this disease.
....
Assuming arguendo that the hospital records tend to prove a diagnosis of alcoholism, there is no competent and legal evidence in the record to support such a diagnosis. Absent such evidence, the hearsay medical records alone are not sufficient to sustain a finding that Clowes was an alcoholic.

[Id. at 597-99, 538 A.2d 794.]
See also Gimello v. Agency Rent-A-Car Systems, Inc., 250 N.J.Super. 338, 361-62, 594 A.2d 264 (App.Div.1991).
Clowes compels an affirmance of the dismissal of plaintiff's handicap discrimination claim. Plaintiff failed to present any medical evidence that hypersensitivity to second-hand smoke is a recognized medical condition or that he suffers from a such a condition. The only medical evidence plaintiff presented in opposition to defendants' motion for summary judgment was a letter from a Dr. Gary Gross, addressed "To whom it may concern," which reads as follows:
Thirty-six year old Mr. Heitzman was seen for complaints of cigarette smoke related symptoms. He is quite sensitive to smoke exposure which causes difficulty breathing, coughing, sorethroat, nasal irritation and frequent ear infections. Unfortunately he has had to work closely with smokers at various positions at the Monmouth County Reclamation Center despite a no smoking policy. I would strongly recommend that Mr. Heitzman be allowed to work away from smokers even if it means he be transferred to another county agency.
This letter does not constitute the kind of evidence which could support a handicap discrimination claim under the LAD. First, we note that the letter is dated November 18, 1996, which was more than three years after plaintiff was transferred out of his position at the reclamation center. Consequently, the letter has only limited probative value concerning any medical condition plaintiff may have suffered while he worked at that facility. Furthermore, the letter does not assert that plaintiff's sensitivity to second-hand smoke is "caused by bodily injury, birth defect or illness." It does not assert, for example, that plaintiff suffers from asthma, emphysema or any other pulmonary disease which could make a person especially sensitive to smoke. The letter only states that plaintiff is "quite sensitive to smoke exposure" which causes the described difficulties. Although plaintiff argues that an opinion that his problems are "caused by bodily injury" or by "illness" is implicit in the letter, we see no reason why, if that were the doctor's opinion, he could not have simply said in unequivocal language that plaintiff suffers a "physical disability" and that the disability is "caused by bodily injury ... or illness." In addition, the doctor's conclusions rest entirely on plaintiff's subjective "complaints of cigarette smoke related symptoms." The letter does not refer to any tests or examinations which showed the existence of a pulmonary condition or allergy that would provide a medical explanation for plaintiff's complaints. Consequently, Dr. Gross' letter falls far short of the kind of expert medical opinion required to support a handicap discrimination claim.
Plaintiff also argues that even if he does not suffer from any actual "handicap" as defined under the LAD, the trial court should have denied summary judgment because he presented evidence that defendants perceived he suffers from a handicap. See Rogers v. Campbell Foundry Co., 185 N.J.Super. 109, 112, 447 A.2d 589 (App.Div.) ("[T]hose perceived as suffering from a particular handicap are as much within the protected class as those who are actually handicapped."), certif. denied, 91 N.J. 529, 453 A.2d 852 (1982). However, there is no evidence that defendants' efforts to respond to plaintiff's complaints about second-hand smoke reflected their perception that he is a handicapped person within the intent of the LAD. Rather, defendants' actions appear to have been simply a well-meaning effort to ameliorate a condition about which plaintiff had complained. If such efforts were found *302 to constitute an admission that plaintiff was considered to be handicapped, it could have the unfortunate consequence of discouraging employers from making voluntary efforts to address employee complaints about working conditions.
Therefore, we affirm the summary judgment dismissing plaintiff's handicap discrimination claim.

II
The second count of plaintiff's complaint alleges that he was subjected to a hostile work environment because of a series of anti-Semitic comments. Initially, we are satisfied that plaintiff falls within a protected class under the LAD even though he does not claim to be a practicing Jew. Because plaintiff's mother was Jewish, he may maintain a claim of discrimination on the basis of ancestry regardless of his religion. Moreover, even if plaintiff were not actually Jewish, he could pursue a claim under the LAD because there is evidence defendants perceived him to be Jewish. See Rogers v. Campbell Foundry Co., supra, 185 N.J.Super. at 112, 447 A.2d 589; Poff v. Caro, 228 N.J.Super. 370, 377-78, 549 A.2d 900 (Law Div.1987).
Plaintiff asserts only a hostile work environment claim. He does not allege that he was demoted or that any other adverse employment action was taken against him because of his ancestry or defendants' perception of his ancestry and/or religion. Furthermore, plaintiff is no longer employed and has no interest in becoming reemployed by Monmouth County. Consequently, he does not seek any form of equitable relief. As his counsel confirmed at oral argument, plaintiff seeks solely compensatory damages for the pain, suffering and humiliation he claims to have suffered as a result of an alleged discriminatory hostile work environment.
At his deposition, plaintiff identified eight comments he considered to be anti-Semitic upon which he grounds his hostile work environment claim. Plaintiff testified that when he told his supervisor, Dodig, and a coworker that he was going to the Catskills on his vacation, the coworker said, "Oh, the Jewish Alps." Plaintiff also alleged that when Dodig saw a load of yarmulkes spill out of a garbage truck, he laughingly referred to them as "all those skullcaps." On another occasion, a coworker who played golf complained that a particular country club "was barred to anyone but Jews." Plaintiff also testified that Dodig asked him whether he ate "ham, bacon or pork" and inquired several times about what he was doing on Friday nights. In addition, plaintiff overheard Dodig tell a coworker about a Jewish real estate salesman who tried to sell him a condominium which Dodig thought was close to the reclamation center. When Dodig asked the salesman whether the housing complex was "close to the dump," the salesman said it was a mile away, which Dodig laughingly described as "a Jewish mile." On another occasion, plaintiff overheard Dodig describe his own girlfriend as a "Jew bitch." Finally, a coworker named Kitzman once said to plaintiff: "[I]f Hitler was alive, he would make a lamp shade out of [you]." Plaintiff admitted that he never complained to anyone about any of these comments.
The leading New Jersey cases dealing with hostile work environment discrimination claims are Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993) and Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998). In Lehmann, the Court held that to prove a hostile work environment sexual harassment case under the LAD, a plaintiff must show "conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment." 132 N.J. at 603, 626 A.2d 445. In Taylor, the Court held that the same standard applies to other types of hostile work environment discrimination claims, such as those involving racial discrimination or, as in this case, ancestry. 152 N.J. at 498, 706 A.2d 685; see also Leonard v. Metropolitan Life Ins. Co., 318 N.J.Super. 337, 343-44, 723 A.2d 1007 (App.Div.1999). This standard "conforms to the standard for establishing workplace [discriminatory] harassment under federal Title VII law" adopted by the Supreme Court in Meritor Sav. Bank v. Vinson, *303 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 60 (1986). Taylor, supra, 152 N.J. at 498, 706 A.2d 685. Consequently, our courts have relied upon federal court decisions under Title VII in reviewing hostile work environment discrimination claims. See, e.g., id. at 499-507, 706 A.2d 685; Lehmann, supra, 132 N.J. at 600-01, 607-08, 618-19, 622-23, 626 A.2d 445; Muench v. Township of Haddon, 255 N.J.Super. 288, 295-302, 605 A.2d 242 (App.Div.1992).
In Lehmann, the Court held that an employer is strictly liable for equitable relief to remediate any discriminatory hostile environment found in the workplace. 132 N.J. at 616-17, 626 A.2d 445. However, a claim for compensatory damages is governed by "agency principles." Id. at 619, 626 A.2d 445.[1] Under these principles, "an employer whose supervisory employee is acting within the scope of his or her employment [is] liable for the supervisor's conduct in creating a hostile work environment," ibid., and "even in the more common situation in which the supervisor is acting outside the scope of his or her employment, the employer will be liable in most cases for the supervisor's behavior under the exceptions set forth in § 219(2) [of the Restatement (Second) of Agency].[2]" Id. at 619-20, 626 A.2d 445. An employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor "to control the day-to-day working environment" facilitates the harassing conduct. Id. at 620, 626 A.2d 445; see Restatement (Second) of Agency § 219(2)(d).[3] But under agency principles, an employer is not generally liable for harassing conduct by coworkers, "[b]ecause employers do not entrust mere co-employees with any significant authority with which they might harass a victim." Parkins v. Civil Constructors of Ill., Inc., 163 F. 3d 1027, 1032 (7th Cir.1998). Consequently, when a coworker engages in harassing conduct, the employer is liable only if "management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment." Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1421 (7th Cir.1986); see also 1 Barbara Lindenmann & Paul Grossman, Employment Discrimination Law 822 (3d ed. 1996) (An employer is liable for the harassing conduct of a coworker "only if it had actual or constructive notice of the harassment and failed to take prompt and appropriate corrective action."). Moreover, it has been recognized that an employer "is unlikely to know or have reason to know of casual, isolated, and infrequent slurs." Hunter, supra, 797 F.2d at 1422.
Applying these principles, we conclude that Monmouth County cannot be held *304 liable for compensatory damages for the alleged statement to plaintiff that "if Hitler were alive, he would make a lampshade out of [you]." The person who allegedly made this comment, Joseph Kitzman, was not one of plaintiff's supervisors but rather a coworker. Moreover, plaintiff did not present evidence that anyone overheard Kitzman's comment, and plaintiff admittedly did not tell his supervisors about the comment. Therefore, unlike in Lehmann and Taylor, both of which involved alleged discriminatory harassing conduct by supervisory employees, we can perceive of no basis for concluding that Kitzman was acting within the scope of his employment when he allegedly uttered this anti-Semitic comment or that Monmouth County could be found vicariously liable for Kitzman's comment under any of the subsections of section 219(2) of the Restatement (Second) of Agency.[4]
We turn to the question whether a reasonable person of plaintiff's ancestry would consider the alleged anti-Semitic comments made by or in the presence of plaintiff's supervisors to be sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment. Under this standard, a hostile work environment discrimination claim cannot be established by epithets or comments which are "merely offensive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L. Ed.2d 295, 302 (1993). An employment discrimination law such as the LAD is not intended to be "a `general civility' code" for conduct in the workplace. Faragher, supra, 524 U.S. at ___, 118 S.Ct. at 2283-84, 141 L.Ed.2d at 677 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, ___, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201, 207 (1998)). "[D]iscourtesy or rudeness should not be confused with racial [or ethnic] harassment," and "a lack of racial [or ethnic] sensitivity does not, alone, amount to actionable harassment." Id. at ___, 118 S.Ct. at 2283, 141 L.Ed.2d at 676 (quoting Lindemann & Grossman, supra, at 349). Thus, "`simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the `terms and conditions of employment.'" Id. at ___, 118 S.Ct. at 2283, 141 L.Ed.2d at 676 (citation omitted). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." Id. at ___, 118 S.Ct. at 2284, 141 L.Ed.2d at 677. Ultimately, "whether an environment is `hostile' or `abusive' can be determined only by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, supra, 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302-03; see also Taylor, supra, 152 N.J. at 499, 706 A.2d 685.
We are convinced that no reasonable trier of fact could conclude that the anti-Semitic comments which were allegedly made to plaintiff by or in the presence of his supervisors were so severe or pervasive that a reasonable person of Jewish ancestry would believe that the conditions of employment had been altered and that the working environment was hostile or abusive. Even viewing the evidence most favorably to plaintiff, as required on a motion for summary judgment, Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995), most of the comments upon which plaintiff grounds his hostile work environment discrimination claim, such as the inquiries about what he was doing on Friday nights and his dietary habits, the reference to plaintiff's vacation destination as the "Jewish Alps," the comment about the country club which excluded non-Jews, and the characterization of Yarmulkes as "skullcaps," were at worst "teasing" remarks which were not sufficiently extreme to create an abusive or hostile workplace. His supervisor Dodig's characterization of his own girlfriend as a "Jew bitch" and his comment about a "Jewish mile" were both directed at other persons. Although a reasonable person of Jewish ancestry undoubtedly would find these *305 comments to be offensive, a derogatory comment about another person generally does not have the same sting as an ethnic slur directed at a minority group member. Cf. Taylor, supra, 152 N.J. at 506, 706 A.2d 685 (noting that one of circumstances which supported the Court's conclusion that a racial slur was sufficiently severe to alter the conditions of employment was that it was "directed against" plaintiff). Moreover, the comments were sporadic and casual, and did not involve any physical threat or humiliation or any direct interference with plaintiff's work performance. See Harris, supra, 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302-03. Consequently, these offensive comments did not rise to the level required to demonstrate a discriminatory hostile work environment. See id. at 21-23, 114 S.Ct. at 370-71, 126 L.Ed.2d at 301-03; Adusumilli v. City of Chicago, 164 F.3d 353, 361-62 (7th Cir.1998); Bolden v. PRC, Inc., 43 F.3d 545, 550-52 (10th Cir.1994), cert. denied, 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995); Valdez v. Mercy Hosp., 961 F.2d 1401, 1402-03 (8th Cir.1992).
Finally, we consider it noteworthy that even though plaintiff complained incessantly about the second-hand smoke at the reclamation center, he never complained to anyone about the alleged anti-Semitic comments upon which he now grounds his hostile work environment discrimination claim. Instead, the first time this grievance surfaced was when plaintiff filed this lawsuit. Therefore, the absence of any contemporaneous evidence that plaintiff actually considered his working environment to be discriminatorily hostile or abusive reinforces our conclusion that, viewed objectively, the alleged anti-Semitic comments of plaintiff's supervisors were not sufficiently severe or pervasive for a trier of fact to find that plaintiff's working environment was hostile or abusive. See Taylor, supra, 152 N.J. at 507, 706 A.2d 685.
Affirmed.
LESEMANN, J.A.D., concurring in part and dissenting in part.
I concur in the majority's disposition of plaintiff's first claim (that based on sensitivity to second-hand smoke) and I also agree with much of the analysis of plaintiff's claim of ethnic discrimination under the Law Against Discrimination (LAD). However, I disagree with the conclusion that "the alleged anti-Semitic comments made to plaintiff or in plaintiff's presence were not sufficiently severe or pervasive to create a discriminatory hostile work environment." Accordingly, I dissent from the affirmance of the trial court's dismissal of that portion of plaintiff's complaint.
In Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 606-07, 626 A.2d 445 (1993), a sexual harassment case, the Supreme Court specifically rejected a requirement that one claiming a hostile work environment must show a "regular and pervasive" pattern of misbehavior. Rather, the Court adopted a disjunctive test: the objectionable conduct must be either "severe or pervasive" and a showing of one or the other will suffice to demonstrate a hostile workplace. Id. at 592, 626 A.2d 445. Thus the Court noted that, while such a case would probably be "rare and extreme", it is possible that one single incident could be "so severe that it would ... make the working environment hostile." Id. at 606-07, 626 A.2d 445. However, the more frequent pattern, it said, would probably consist of "numerous incidents that, if considered individually, would be insufficiently severe to state a claim, but considered together are sufficiently pervasive to make the work environment intimidating or hostile." Id. at 607, 626 A.2d 445.
Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998), where the Court held that the Lehmann analysis applied to racial or ethnic discrimination as well as sexual harassment, is an example of the first, or "rare and extreme", kind of discrimination: a single comment which was so insulting and abusive that, by itself, it caused "the environment to become hostile and abusive." Id. at 502-03, 706 A.2d 685. This case is the converse of Taylor v. Metzger. It represents the more frequent pattern described by the Court, where no single incident would be sufficient to justify a finding of a hostile workplace, but the pervasive pattern of anti-Semitic comments, taken together, is more than sufficient to justify such a conclusion.
*306 The majority acknowledges that the comments aimed at plaintiff were anti-Semitic, and also seem to acknowledge that "a reasonable person of Jewish ancestry undoubtedly would find [at least some of] these comments to be offensive." Nevertheless, it concludes that the remarks were "at worst `teasing' remarks" which were not sufficiently extreme to create an abusive or hostile workplace. I find that characterization unwarranted, since I believe a reasonable jury could well conclude that plaintiff had been subjected to a most unpleasant, most hostile, and grossly abusive workplace which he should not have been required to tolerate.
Obviously, questions about one's diet, or intended activities on Friday night, when made by friends in a friendly manner, could be harmless and even pleasant. Similarly, "teasing," in a pleasant, non-malicious manner could also be pleasant or, at most, harmless. But that is not what is involved here.
Throughout his deposition, plaintiff maintained that supervisor Dodig was anti-Semitic and Dodig's comments and attempts at humor were delivered in that context. For example, plaintiff maintained that Dodig's inquiries as to what plaintiff intended to do on a Friday night were regular and pervasive. As plaintiff described them,
He would give me a hard time about different things, and a lot of times he would, you know be on my case, like on a Friday. And he would have me all worked up and everything, and Kyle [Dodig] knew exactly what he was doing.
Q. And you regarded that inquiry, what are you doing tonight, to be anti-Semitism?
A. Yes, I did. Being that it came from the mouth of Kyle Dodig, and because of all the other anti-Semitic things that he said or engaged in prior to those different Fridays where I was questioned.
Most of the comments cited by plaintiff, and acknowledged by the majority, involved some attempt at humor or sarcasm premised on some alleged unattractive characteristic ascribed to Jewsand to plaintiff because he was (or was assumed to be) Jewish. And there were a considerable number of such comments. The Supreme Court has noted that "there is neither a threshold `magic number' of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." Taylor v. Metzger, supra, 152 N.J. at 499, 706 A.2d 685. However, the number of offensive incidents is certainly relevant to the question of whether they are so pervasive as to create a hostile or abusive work environment. One or two such incidents should probably be overlooked as constituting nothing more than bad manners. Three would seem to be stretching things and four would seem to exceed reasonable toleranceor, to repeat the critical point, at least a jury could so find. Here we had eight or nine.[1]
I do not understand the reasoning which leads the majority to conclude that no reasonable trier of fact could find that such pervasive conduct created a "hostile or abusive" working environment. In fact, I see every reason why one in plaintiff's position might well conclude, quite reasonably, that he was being required to work in a hostile and abusive environment. If Dodig was what plaintiff says he was; if Dodig said what plaintiff claims he said, as often as plaintiff says he did, and in the manner plaintiff describes, it seems to me that virtually anyone in plaintiff's position would regard that environment as "hostile and abusive". Or, to return again to the central point, at least a reasonable jury could so find.
I see no reason why plaintiff should be required to tolerate what plaintiff says he *307 was exposed to here. LAD may not have legislated against "discourtesy or rudeness", or adopted a "general civility code" but it did outlaw a workplace in which one is required to live with and endure ethnic slurs of the quality and frequency with which Dodig and his associates belabored plaintiff. Plaintiff should not be required to accept such conduct any more than an African-American should be required to tolerate anti-black jokes or a woman tolerate a pattern of sexist humor or snide sexual remarks.
The majority purports to distinguish between hostile, anti-Semitic and abusive comments on the one hand, and harmless teasing or a simple lack of civility on the other. There certainly is a difference between the two. However, whether comments constitute one or the other will frequently depend on subtle shadings and variances in the manner in which things are said, the relationship between the speaker and the target of the "humor", and the entire panoply of facts the surrounding circumstancesin which the comments are made.
Here, plaintiff and Dodig were not friends. Plaintiff described as best he couldand with considerable claritythe anti-Semitism with which Dodig's comments (and those of the others) were laden. He explained why he found those comments objectionable, and why they did not constitute the harmless joshing which the majority hypothesizes. He submitted a reasonable, rational claim. Whether a reasonable Jewish person in his position would have considered the workplace hostile or abusive is a question that should be referred to, and decided by, a jury.
Ethnic or sexist humor has little to commend it. The majority acknowledges that it is frequently offensive. While I certainly do not advocate outlawing it, I do not believe we need be overly solicitous in preserving and protecting it. The Supreme Court's comment on that point in Lehmann, supra, 132 N.J. at 612, 626 A.2d 445 (although said there in relation to a sex harassment claim) is on point and profound:
... LAD is remedial legislation. Its very purpose is to change existing standards of conduct. Thus, the reasonableness requirement must not be used to hold that the prevailing level of discrimination is per se reasonable, or that a reasonable woman would expect sexual harassment on entering a historically male-dominated workplace. The LAD is designed to remediate conditions of hostility and discrimination, not to preserve and immunize pre-existing hostile work environments.

[Emphasis added.]
I would reverse the dismissal of plaintiff's claim of a LAD violation.
NOTES
[1] The Court in Lehmann also held that punitive damages may be recovered against an employer for a discriminatory hostile work environment "only in the event of actual participation by upper management or wilful indifference." 132 N.J. at 625, 626 A.2d 445.
[2] This subsection of the Restatement states that:

A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
(a) the master intended the conduct or the consequences, or
(b) the master was negligent or reckless, or
(c) the conduct violated a non-delegable duty of the master, or
(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
[3] The Supreme Court of the United States has held that an employer's vicarious liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to e17, for a discriminatory hostile work environment created by a supervisor is also governed by the principles set forth in § 219(2). Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, ___, 118 S.Ct. 2257, 2267-68, 141 L.Ed.2d 633, 650-52 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, ___, 118 S.Ct. 2275, 2290-91, 141 L.Ed.2d 662, 685-86 (1998). Applying those principles, the Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Ellerth, supra, 524 U.S. at ___, 118 S.Ct. at 2270, 141 L.Ed.2d at 655; Faragher, supra, 524 U.S. at ___, 118 S.Ct. at 2292, 141 L.Ed.2d at 689. However, an employee may defeat such a claim by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, supra, 524 U.S. at ___, 118 S.Ct. at 2270, 141 L.Ed.2d at 655; Faragher, supra, 524 U.S. at ___, 118 S.Ct. at 2293, 141 L.Ed.2d at 689.
[4] The parties have informed us that Mr. Kitzman is now deceased. Therefore, even if plaintiff were still employed by Monmouth County, it obviously would not be possible to transfer Kitzman or grant any other form of equitable relief directed at this former employee.
[1] The majority refers to eight incidents. My count is nine. While the ugly remark about Hitler and a lamp shade may not be actionable because it was not made by or in the presence of plaintiff's superior, I believe that comment should be considered in weighing the impact of the other statements which were made by or in the presence of a superiorparticularly since plaintiff claimed that his superiors knew that Kitzman, who make the remark, was an anti-Semite.

Further, the count of eight or nine incidents treats the comments about diet and Sabbath observances as constituting one incident each. In fact, plaintiff maintained that such comments were made a number of times, and thus, according to plaintiff, there were actually considerably more than eight or nine distinct incidents.