40 A.3d 1171

MYRON COWHER, PLAINTIFF-APPELLANT, v. CARSON & ROBERTS,[1] GARY MERKLE, JAY UNANGST, AND NICK GINGERELLI, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 29, 2011—Decided April 18, 2012.

---

[1] Properly known as Carson & Roberts Site Construction & Engineering, Inc.

Before Judges PAYNE, REISNER and SIMONELLI.

*Robert A. Scirocco* argued the cause for appellant.

*Robert A. Goodsell* argued the cause for respondents (*Post, Polak, Goodsell, MacNeill & Strauchler, P.A.,* attorneys; *Frederick B. Polak,* of counsel; *Debra J. Surgan,* on the brief).

The opinion of the court was delivered by

PAYNE, P.J.A.D.

Plaintiff, Myron Cowher, appeals an order of summary judgment entered against him and in favor of his employer, Carson & Roberts Site Construction & Engineering, Inc., and his supervisors, Gary Merkle, Jay Unangst and Nick Gingerelli, dismissing his claim for damages pursuant to the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42. Plaintiff claims that defendants, wrongly perceiving him to be Jewish, directed anti-Semitic comments at him on a daily basis from January or February 2007 to May 2008, when plaintiff left his employment for unrelated reasons, thereby creating a hostile work environment in violation of *N.J.S.A.* 10:5–12a. In granting summary judgment, the trial court held that admitted anti-Semitic slurs uttered by Unangst and Gingerelli were not actionable because New Jersey did not recognize a cause of action premised upon perceived membership in a protected group other than disabled persons and because plaintiff had offered no evidence that defendants perceived him to be Jewish. We reverse as to all defendants with the exception of Gary Merkle, as to whom we find summary judgment was properly entered.

I.

Plaintiff was employed as a truck driver by Carson & Roberts from April 2006 until May 28, 2008. During the period relevant to his complaint of anti-Semitic harassment, plaintiff was directly supervised by Unangst, the company's Logistics Manager, and, when Unangst was unavailable, by Gingerelli, the company's Service Equipment Manager. Unangst and Gingerelli, whom Unangst described as "bookends, partners," shared an office in a

building on the premises that was operated as a shop. Merkle was the company's Facility Manager. As Merkle described it, "Jay [Unangst] handled the dispatching, Nick [Gingerelli] handled the service work, I handled the administrative functions."

In his complaint, filed on December 18, 2008, plaintiff alleged the continual utterance of explicit slurs about Jews directed toward him from January 2007 up to May 28, 2008. But in a response to plaintiff's demand for admissions, dated December 16, 2009, defendants denied that: "One or more of the defendants on one or more occasions made jokes or derogatory comments about Jews while the plaintiff was employed by the defendants." However, on March 15, 2010, in response to defendants' demand for production of documents, plaintiff produced DVDs that contained video-recordings[2] of the use by Unangst and Gingerelli of the following comments in plaintiff's presence: "Jew Bag," "Fuck[ ] you Hebrew," "Jew Bastard," "Where are [you] going, Jew," "I have friends in high places, not in fucking temple," "Jew Shuffle," "If you were a German, we would burn you in the oven," "We have Jews and Niggers that work here," and "Only a Jew would argue over his hours." Plaintiff claimed in his deposition that such remarks occurred on a daily basis and were made in front of people coming to service the company's equipment and delivery persons. Plaintiff testified that both Unangst and Gingerelli believed that he was Jewish, and because of their comments, several other employees did, as well.

In his deposition, given after the DVDs had been produced, Unangst admitted that they contained an accurate depiction of what occurred. He also testified that "perhaps" he had commented to plaintiff about "Jew money," and he admitted that he used the Hebrew folk song Hava Nagila as the ring tone for calls on his cell phone from plaintiff. When the deposition of Gingerelli was taken, he admitted that he had called plaintiff "Jew bag,"

---

[2] The record on appeal does not contain copies of the DVDs. Nonetheless, their content and accuracy have not been disputed.

testifying that he "couldn't put a number" on the times he had done so, stating further, "20 times, I don't know to be exact." Gingerelli additionally admitted that he probably called plaintiff a "bagel meister," a "Jew burger" and a "fucking Hebrew." Plaintiff testified that he told both men to stop the comments, but that they had not done so.

Plaintiff testified that Merkle had never made any anti-Semitic comments to him. However, plaintiff stated that Merkle had been present on a half-dozen occasions when Unangst or Gingerelli made offensive comments, and on a couple of those occasions, Merkle told them that was not the right thing to do. Plaintiff testified additionally that, commencing early in 2007, he had complained directly to Merkle. Plaintiff testified:

> I told him at the time, I said I'm not sure why they're doing what they're doing, but they're referring to me as every Jewish slur there is that they could think of. And he said [the first time], well, just laugh it off and they'll forget about it.

When, after a few weeks, the comments had not abated, plaintiff told Merkle that the same thing was still going on, and this time Merkle responded, "ignore it this time and it'll go away." Plaintiff testified that he spoke to Merkle "multiple times after that," and that Merkle counseled him to ignore the harassment or told him it would stop. Although Merkle agreed to speak to Unangst and Gingerelli, plaintiff "assume[d] he didn't," because "it progressively got worse, especially around May."

In May 2008, when delivering trailers to the farm of the company President, Dan Carson, plaintiff told Carson that he "needed to speak to him regarding issues in their back office and the attacks that Jay and Nick were throwing at me, verbal attacks." However, plaintiff did not specify the nature of the attacks. Carson instructed him to make an appointment through Merkle. However, before he could do so, plaintiff left the company as the result of a disability.

While now admitting to the comments that plaintiff has alleged, Unangst and Gingerelli have claimed they merely formed parts of a locker-room type exchange of racial, ethnic, religious, and ap-

pearance-based comments in which plaintiff willingly participated, along with them and other co-employees. Additionally, they have denied that they perceived plaintiff to be Jewish, and they have traced the origin of their comments to the fact that plaintiff and his wife took a cut on the proceeds of a Super Bowl pool that they were running, thereby conforming to the stereotype of Jews as avaricious.[3] Merkle claimed that he received no complaints from plaintiff, and he characterized the "banter" that he had overheard between Gingerelli and plaintiff as coming from "two grown men engaging each other in light heartedness."

## II.

A Jewish plaintiff alleging an anti-Semitic hostile work environment in violation of the LAD "must demonstrate that the defendant's 'conduct (1) would not have occurred but for the employee's [Judaism]; and [the conduct] was (2) severe or pervasive enough to make a(3) reasonable [Jew] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" *Taylor v. Metzger,* 152 *N.J.* 490, 498, 706 *A.*2d 685 (1998) (quoting *Lehmann v. Toys 'R' Us,* 132 *N.J.* 587, 603–04, 626 *A.*2d 445 (1993)). In determining whether the conduct is "severe or pervasive," the Court has held that "it is the *harassing conduct* " that must be severe or pervasive, not its effect on the plaintiff or on the work environment. *Lehmann, supra,* 132 *N.J.* at 606, 626 *A.*2d 445 (citing *Ellison v. Brady,* 924 *F.*2d 872, 878 (9th Cir.1991)).

Defendant successfully argued before the trial court that plaintiff could not meet the first prong of the *Lehmann* test because he was not Jewish, and that the allegation that he was perceived to be Jewish was insufficient. We regard the court's interpretation of New Jersey law to have been mistaken.

---

[3] Plaintiff traces the origin of the comments to his request, in December 2006, to obtain leave from work to attend a bris.

The court was correct that the perception issue first arose in a disability context. In *Andersen v. Exxon Co.*, 89 *N.J.* 483, 446 *A.*2d 486 (1982), the Director of the Division on Civil Rights affirmed the finding of an administrative law judge that Exxon had discriminated against Andersen when it declined to hire him as a truck driver on the mistaken ground that a physical handicap arising from spinal fusion surgery disabled him from meeting the job's performance requirements. On appeal, the Supreme Court affirmed a judgment in plaintiff's favor. In doing so, the Court found that, in the absence of competent medical evidence, Exxon did not reasonably arrive at the conclusion that Andersen's handicap precluded his performance of the job. It held in that regard that "[u]ndifferentiated fear and generalities will not suffice." *Id.* at 497, 446 *A.*2d 486. Discussing "perceived" disabilities, the Court observed in a much-quoted footnote:

The implications of the doctrine are present in the context of this case, where the employer has determined that complainant's condition was serious enough to deny him employment. We agree that "[p]rejudice in the sense of a judgment or opinion formed before the facts are known is the fountainhead of discrimination engulfing medical disabilities which prove on examination to be unrelated to job performance or to be non-existent." *Barnes v. Washington Natural Gas Co.*, 22 *Wash.App.* 576, 591 *P.*2d 461 (Ct.App.Wash.1979); accord, *Dairy Equip. Co. v. Dept. of Industry, etc.*, 95 *Wis.*2d 319, 290 *N.W.*2d 330 (S.Ct.Wis.1980) (perceived disability based on single kidney).

[*Id.* at 495–96 n. 2, 446 *A.*2d 486.]

*Andersen* was followed in *Rogers v. Campbell Foundry Co.*, 185 *N.J.Super.* 109, 447 *A.*2d 589 (App.Div.), *certif. denied,* 91 *N.J.* 529, 453 *A.*2d 852 (1982). In *Rogers,* the Director of the Division on Civil Rights found the employer had committed an act of unlawful employment discrimination when it refused a job to Rogers, whose chest x-ray disclosed a prominent hilar shadow on the left side. *Id.* at 111, 447 *A.*2d 589. The employer's concern was that the condition would make it more likely that plaintiff would contract silicosis or pneumoconiosis from silica dust at the employer's foundry. It made its determination pursuant to a policy to reject all applicants with lung scarring on that basis, and despite uncontradicted evidence that plaintiff's condition was normal and nondisabling. *Ibid.* On appeal, we affirmed the Director's

decision on the basis of footnote two in *Andersen*, interpreting the out-of-state cases upon which the Court relied there as standing for "the rule that those perceived as suffering from a particular handicap are as much within the protected class as those who are actually handicapped." *Id.* at 112, 447 *A*.2d 589. We stated:

> We understand the import of footnote 2 in *Andersen* to be that where, as here, the physical condition perceived by the prospective employer as constituting a handicap is actually normal and nondisabling, the provisions of the Law Against Discrimination, *N.J.S.A.* 10:5–1 *et seq.*, are nevertheless applicable.
>
> [*Id.* at 113, 447 *A*.2d 589.]

*Rogers* was again followed in the Law Division's decision in *Poff v. Caro*, 228 *N.J.Super.* 370, 549 *A*.2d 900 (Law Div.1987), a case in which a landlord declined to rent an apartment to three gay men as the result of his fear that they would contract AIDS. In granting, at the request of the Division on Civil Rights, a preliminary injunction restraining the landlord from renting the apartment to others while the discrimination complaint was pending, Judge Humphreys found that if the landlord's refusal to rent was based on the proposed lessees' perceived handicap, as was probable, it constituted a violation of the LAD. *Id.* at 374, 549 *A*.2d 900. The judge observed, in language that is relevant here:

> The complainants here do not have AIDS and therefore do not have a "handicap." However, discrimination based on a perception of a handicap is within the protection of the Law Against Discrimination. Distinguishing between actual handicaps and perceived handicaps makes no sense. For example, in the case of racial and religious discrimination, the Law Against Discrimination cannot reasonably be read to prohibit a landlord from refusing to rent to a member of a racial or religious minority, but to allow a landlord to refuse to rent to a person who is only *perceived* by the landlord to be such a member.... "Prejudice in the sense of a judgment or opinion formed before the facts are known is the fountainhead of discrimination engulfing medical disabilities which prove on examination to be ... non-existent." *See Andersen v. Exxon*, 89 *N.J.* at 495, n. 2, 446 *A*.2d 486.
>
> [*Id.* at 377–78, 549 *A*.2d 900 (some citations omitted).]

Discrimination on the bases of a perceived handicap was again discussed in *Gimello v. Agency Rent–A–Car Systems, Inc.*, 250 *N.J.Super.* 338, 594 *A*.2d 264 (App.Div.1991). And there, we relied on *Andersen, Rogers* and *Poff*, a specific regulation applying the LAD to perceived handicaps, *N.J.A.C.* 13:13–1.3(1), and the out-of-state cases of *Barnes* and *Dairy Equipment* in upholding a

determination by the Director of the Division on Civil Rights that Gimello's employer committed discrimination in terminating Gimello's employment on the ground of his obesity when that condition did not prevent him from doing his job. *Id.* at 361–65, 594 *A.*2d 264.

■ However, our decision in *Heitzman v. Monmouth County,* 321 *N.J.Super.* 133, 728 *A.*2d 297 (App.Div.1999) establishes that a perceived characteristic that, if genuine, would qualify a person for the protections of the LAD need not be limited to a disability. In that case, plaintiff, a person of Jewish ancestry who was not a practicing Jew, claimed in a suit brought pursuant to the LAD that a series of anti-Semitic comments directed at him created a hostile work environment. *Id.* at 138, 728 *A.*2d 297. The trial court rejected plaintiff's claim on the ground that he was not Jewish, and even if he had been, the comments were not sufficiently severe or pervasive to support a hostile work environment claim. *Id.* at 139, 728 *A.*2d 297.

Significantly, on appeal, we rejected the trial court's first basis for summary judgment holding that plaintiff was an ancestral Jew, and "even if plaintiff were not actually Jewish, he could pursue a claim under the LAD because there is evidence defendants perceived him to be Jewish." *Id.* at 142, 728 *A.*2d 297 (citing *Rogers, supra,* 185 *N.J.Super.* at 112, 447 *A.*2d 589; *Poff, supra,* 228 *N.J.Super.* at 377–78, 549 *A.*2d 900). We also held that a particularly objectionable comment by a co-employee could not be a basis for liability on the part of Monmouth County because there was no evidence that it knew or should have known what the co-employee said. *Id.* at 145–46, 728 *A.*2d 297. In a split decision, we upheld the trial court's determination that the comments directed at plaintiff were not severe or pervasive enough to be actionable. *Id.* at 147–48, 728 *A.*2d 297. However, in *Cutler v. Dorn,* 196 *N.J.* 419, 955 *A.*2d 917 (2008), a decision establishing that a plaintiff alleging religion-based workplace harassment has the same burden of proof as that existing for any other plaintiff in a protected class claiming harassment and finding that burden had been met,

*id.* at 438–40, 955 *A.*2d 917, the Court factually distinguished *Heitzman,* but then observed:

> More importantly, however, we never had the opportunity to review the determination reached in *Heitzman.* If the holding in *Heitzman* is perceived, in application, to suggest a different, and higher, threshold for demonstrating a hostile work environment when religion-based harassment is claimed, then that misapprehension must end.
>
> [*Id.* at 440, 955 *A.*2d 917.]

Turning to the present case, we are satisfied that there is no reasoned basis to hold that the LAD protects those who are perceived to be members of one class of persons enumerated by the Act and does not protect those who are perceived to be members of a different class, as to which the LAD offers its protections in equal measure. That self-evident principle is amply demonstrated by the dictum in *Poff* and our holding in *Heitzman* with respect to the applicability of the LAD to cases of religious discrimination premised on perceived membership in a particular faith—a holding unmodified by the Court's decision in *Cutler.*

■ Thus, if plaintiff can demonstrate that the discrimination that he claims to have experienced would not have occurred but for the perception that he was Jewish, his claim is covered by the LAD. Whether such is the case is a matter as to which there is no conclusive evidence. The parties have submitted only their own statements asserting or denying this perception without corroborative proofs. However, in a case such as this involving facially discriminatory conduct, we find it reasonable at this point to infer that the conduct was spurred by plaintiff's perceived status. *See Lehmann, supra,* 132 *N.J.* at 605, 626 *A.*2d 445 ("When [in a claim of sexual harassment] the harassing conduct is sexual or sexist in nature, the but-for element will automatically be satisfied."). Otherwise, legitimate claims could be too easily defeated by self-serving denials on the part of otherwise culpable persons. Accordingly, we find that the trial court was mistaken in holding that plaintiff had failed to meet *Lehmann's* first prong.

■ We thus turn to the issue of whether plaintiff offered prima facie proof to satisfy the "interdependent" second, third and fourth

prongs of *Lehmann, supra,* 132 *N.J.* at 604, 626 *A.*2d 445, thus demonstrating that the conduct of the defendant employees was severe or pervasive enough to make a reasonable person believe that the conditions of plaintiff's employment were altered and that the working environment had been made hostile or abusive. *Id.* at 603–04, 626 *A.*2d 445. In making that determination, "we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Green v. Jersey City Bd. of Educ.,* 177 *N.J.* 434, 447, 828 *A.*2d 883 (2003) (quoting *Shepherd v. Hunterdon Developmental Ctr.,* 174 *N.J.* 1, 19–20, 803 *A.*2d 611 (2002)).

We find the case that is most analogous to the present one to be *Cutler,* a case involving a Jewish police officer. There, plaintiff's supervisor

> commented on Cutler's Jewish ancestry "a couple times a month." [The supervisor] often referred to Cutler as "the Jew" when Cutler was present. On one occasion that was memorable to Cutler, [the supervisor] asked Cutler "where [his] big Jew ... nose was," apparently referencing the fact that Cutler's nose was smallish. According to Cutler, [a police lieutenant] also made comments about persons of Jewish faith. [He] would work into his conversations with Cutler such comments as "Jews are good with numbers," "why didn't you go into your family business ... why are you here," and "Jews make all the money."
>
> [*Cutler, supra,* 196 *N.J.* at 425–26, 955 *A.*2d 917.]

Additionally, a superior officer told Cutler not to wear his yarmulke during Passover, yet another officer was permitted to wear a "Jesus First" pin on his uniform lapel. *Id.* at 427, 955 *A.*2d 917. In another incident, a sticker picturing an Israeli flag was placed on Cutler's locker, surmounted by a German flag. *Ibid.* And, as the "straw that broke the camel's back," during a training video shown in preparation for games that were considered to be the "Jewish Olympics" and an important event in the Jewish community, a fellow officer blurted out "Those Dirty Jews." *Ibid.* The Court held that these occurrences satisfied the requirements for a hostile work environment. *Id.* at 434–36, 955 *A.*2d 917.

Notably, the Court rejected the defendants' argument that the claim should fail as a matter of law because of an atmosphere of derogatory humor in which Cutler participated, derived in part from a "humor file" containing "crass characterizations and other outlandish drawings or caricatures involving public persons or persons within the department." *Id.* at 434, 955 *A.*2d 917. The Court held: "Even in a work setting in which derogatory humor was the norm, this 'humor file' defense fails to be dispositive of Cutler's claim of hostile work environment." *Id.* at 435, 955 *A.*2d 917. The comments

> occurred during the normal give and take of the daily workplace and demonstrated the pervasiveness of an anti-Jewish sentiment that comfortably could be voiced in the police department. The Appellate Division called it "teasing," but that moniker undervalues the invidiousness of these stereotypic references and demeaning comments that were directed at Cutler, or said in his presence.
>
> [*Ibid.* (citation omitted).]

While the comments in the present case differ somewhat from those in *Cutler,* and the present matter lacks episodes such as the flag and yarmulke incidents, we are satisfied that the comments directed at plaintiff were of roughly comparable severity and pervasiveness to those directed at Cutler.

The question whether plaintiff has established prima facie proof of a hostile work environment is complicated in this case by the issue of how to apply an objective "reasonable person" standard with regard to claims by one who does not belong to the protected group against which the discrimination was targeted. In other cases, the Court has evaluated the effect of discrimination on the work environment from the perspective of a reasonable person in the plaintiff's shoes. *See, e.g., Cutler, supra,* 196 *N.J.* at 436, 955 *A.*2d 917 (viewing the evidence from the standpoint of a "reasonable person of Jewish faith and ancestry"); *Taylor, supra,* 152 *N.J.* at 498, 706 *A.*2d 685 (applying a reasonable African–American standard); *Lehmann, supra,* 132 *N.J.* at 611–14, 626 *A.*2d 445 (applying a reasonable woman standard).

In *Lehmann,* the Court explained that its use of an objective, reasonable woman standard was to better serve the LAD's pur-

pose of "eliminat[ing] *real* discrimination and harassment." *Id.* at 612, 626 *A*.2d 445. "An objective reasonableness standard better focuses the court's attention on the nature and legality of the conduct rather than on the reaction of the individual plaintiff, which is more relevant to damages." *Ibid.* Thus, the Court has held:

> When evaluating whether conduct is sufficiently severe or pervasive to create a hostile work environment, we focus on the *"harassing conduct* . . ., not its effect on the plaintiff or the work environment." *Lehmann, supra,* 132 *N.J.* at 606 [626 *A.*2d 445]. That is because neither "a plaintiff's subjective response" to the harassment, *id.* at 613 [626 *A.*2d 445], nor a defendant's subjective intent when perpetrating the harassment, *id.* at 604–05 [626 *A.*2d 445], is controlling of whether an actionable hostile environment claim exists.
>
> [*Cutler, supra,* 196 *N.J.* at 431, 955 *A.*2d 917.]

These statements by the Court lead us to believe that, although plaintiff is not Jewish, the proper question in this case is what effect would defendants' derogatory comments have on a reasonable Jew, rather than on a reasonable person of plaintiff's actual background. Viewed thus, the comments, like those in *Cutler,* could not but have caused the reasonable Jewish listener to "harken . . . back to thoughts of one of the lowest times in mankind's history, the Holocaust." *Id.* at 436, 955 *A.*2d 917. From that perspective, they are undeniably actionable. *Ibid.* As in *Lehmann,* we hold that the effect of defendants' comments on plaintiff is an issue that is relevant to damages, not to the legality of defendants' conduct. *Lehmann, supra,* 132 *N.J.* at 587, 626 *A.*2d 445.

We recognize that anti-Semitic comments are likely to affect a reasonable Jew more profoundly than a reasonable non-Jew, although we do not suggest that any reasonable person should tolerate comments of a nature as offensive as those expressed by Unangst and Gingerelli. Nonetheless, if we were to adopt this latter alternative standard, the threshold for finding a LAD claim to exist would likely be raised.[4] But the LAD is

---

[4] We would nonetheless find the comments to be actionable under either standard.

"*remedial* legislation" the purpose of which "is to change existing standards of conduct." *Lehmann, supra,* 132 *N.J.* at 612, 626 *A.*2d 445. The record in the present matter, construed in plaintiff's favor, *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995), *Prudential Prop. & Cas. Ins. Co. v. Boylan,* 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div), *certif. denied,* 154 *N.J.* 608, 713 *A.*2d 499 (1998), demonstrates that the individual defendants, all of whom were plaintiff's supervisors, were motivated by their belief that plaintiff was Jewish, and thus engaged in "*real* discrimination and harassment" of the kind that the LAD seeks to eliminate. *Ibid.* That their target happened not to be Jewish should not serve to excuse their conduct. We thus find that plaintiff has offered proofs sufficient to meet his prima facie burden with respect to each of *Lehmann's* prongs, thereby establishing a basis for a cause of action against defendant Carson & Roberts under the agency principles that we discussed in *Heitzman, supra,* 321 *N.J.Super.* at 144–45, 728 *A.*2d 297.

### III.

 Defendants claim additionally that the company is entitled to a full defense against plaintiff's claims as the result of the existence of Carson & Roberts' anti-discrimination policy and an anti-harassment policy and procedure for reporting such conduct that plaintiff allegedly failed to utilize. The anti-harassment policy stated:

> Carson & Roberts is an equal opportunity employer and prohibits discrimination against any employee or applicant on the basis of race, color, sex, age, religion, national origin, marital status, religious creed, pregnancy, disability, or any other basis to the extent protected by law.

The policy also forbade harassment and instructed employees that, if they felt they had been harassed, they should immediately inform the harasser, "regardless of his or her position in the company," that their behavior was offensive. Any concerns also should be brought promptly to the attention of the employee's immediate supervisor, and if the harassment was being inflicted by that supervisor, the employee was permitted to contact "any"

supervisor or Human Resources. Contrary to defendants' arguments, that is what the record reflects that plaintiff did, speaking first to Unangst and Gingerelli and then bringing his complaints to Merkle.

▮ Further we do not regard the existence of Carson & Roberts' policy to provide a safe haven to the company and, without more, to exculpate it from liability. When an employer asserts its right to a safe haven, "the efficacy of [its] remedial program is highly relevant to both an employee's claim against the employer and the employer's defense to liability." *Payton v. N.J. Tpk. Auth.,* 148 *N.J.* 524, 537, 691 *A.*2d 321 (1997). An employer is more likely to successfully assert the defense "if its good-faith attempts include periodic publication to workers of the employer's anti[-]harassment policy; an effective and practical grievance process; and training sessions for workers, supervisors, and managers about how to recognize and eradicate unlawful harassment." *Cavuoti v. N.J. Transit Corp.,* 161 *N.J.* 107, 121, 735 *A.*2d 548 (1999).

While "[a] defendant is entitled to assert the existence of an effective ... [anti-]harassment workplace policy as an affirmative defense to vicarious liability[,] ... material issues of disputed fact in the context of a motion record can deny a defendant summary dismissal based on that defense." *Gaines v. Bellino,* 173 *N.J.* 301, 320, 801 *A.*2d 322 (2002). Such is the case here. We thus find material issues of fact to exist with respect to the liability of Carson & Roberts that must be resolved at trial. Summary judgment as to it is reversed.

## IV.

▮ As a final matter, the supervisory employees named in plaintiff's complaint assert on appeal that they cannot be held individually liable for their creation of a hostile work environment. The Court has held that a supervisor is not an "employer" against whom liability can be assessed pursuant to *N.J.S.A.* 10:5–12a. *See N.J.S.A.* 10:5–5e (defining "employer"). However, a supervisor

can be held liable for aiding, abetting and inciting "any of the acts forbidden under [the LAD]." *N.J.S.A.* 10:5–12e. *See Cicchetti v. Morris Cnty. Sheriff's Office,* 194 *N.J.* 563, 591–94, 947 *A.*2d 626 (2008); *Tarr v. Ciasulli,* 181 *N.J.* 70, 82–83, 853 *A.*2d 921 (2004).[5]

In *Tarr,* the Court determined to construe "aid" or "abet" in accordance with section 876(b) of the *Restatement (Second) of Torts* (1979) stating:

> Section 876(b) of the Restatement imposes concert liability on an individual if he or she "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." We agree that the *Restatement* provides the proper standard by which to define the terms "aid" or "abet" under the LAD. Also, the *Restatement* definition is consistent with the common usage of those terms. Thus, in order to hold an employee liable as an aider or abettor, a plaintiff must show that " '(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.' "
>
> [*Id.* at 84, 853 *A.*2d 921 (quoting *Hurley v. Atlantic City Police Dep't,* 174 *F.*3d 95, 127 (3d Cir.1999), *cert. denied,* 528 *U.S.* 1074, 120 *S.Ct.* 786, 145 *L.Ed.*2d 663 (2000)).]

The Court adopted the five factors relied upon in *Hurley* to determine whether "substantial assistance" to the principal violator had been demonstrated: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the other, and (5) the state of mind of the supervisor." *Ibid.* (citing *Restatement, supra,* § 876(b) cmt. d; *Hurley, supra,* 174 *F.*3d at 127 n. 27).

In *Tarr,* the Court held that plaintiff had failed to present evidence of aiding and abetting, having failed to show that the individual defendant, Ciasulli, encouraged the wrongful conduct,

---

5 Contrary to defendants' arguments, we do not find it dispositive that plaintiff did not make specific reference to a legal theory of aiding and abetting or to *N.J.S.A.* 10:5–12e in his complaint, but instead, described the defendants' harassing conduct. *Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* 69, 75–76, 577 *A.*2d 1239 (1990) (construing complaint liberally and holding it need only fairly apprise an adverse party of the claims and issues to be raised at trial).

that he assisted in it, or that he was even present while it occurred. *Id.* at 85, 853 *A.*2d 921. At most, plaintiff offered proof of negligent supervision, which was insufficient to establish liability under *N.J.S.A.* 10:5–12e. *Ibid.* In contrast, the record in the present case, when read in a light most favorable to plaintiff, establishes that Unangst and Gingerelli, who occupied the same small office and to a large extent shared duties, fed off each other in creating or maintaining the "locker room atmosphere" in which comments denigrating plaintiff's supposed religion were encouraged. No evidence has been presented that either acted to restrain the other. Further, as the result of the promulgation of written anti-discrimination and anti-harassment policies by Carson & Roberts, the two men, who both supervised plaintiff, knew or should have known of the wrongful nature of their conduct. We thus leave to the jury a decision as to whether they should be held individually liable.

■ We find no ground for individual liability on the part of Merkle. The record establishes that he worked in a different building from Unangst and Gingerelli, he never uttered a discriminatory comment himself, and he was infrequently present when the discriminatory comments were uttered. Plaintiff admits that, on occasion, Merkle pointed out to Unangst and Gingerelli the wrongful nature of their remarks. At most, Merkle was ineffective in curing the conduct that plaintiff claims to have brought to his attention. However, the Court has held that such a failure to act, without more, "fall[s] well short of the 'active and purposeful conduct' that we have held is required to constitute aiding and abetting for purposes of their individual liability." *Cicchetti, supra,* 194 *N.J.* at 595, 947 *A.*2d 626 (citation omitted).

As a consequence, we reverse the trial court's dismissal of claims against Unangst and Gingerelli; we affirm as to Merkle.

Summary judgment in favor of Carson & Roberts, Jay Unangst and Nick Gingerelli is reversed; summary judgment in favor of Gary Merkle is affirmed.