**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3129-21

BRENDA AZANEDO,

     Plaintiff-Appellant,

v.

ALARIS HEALTH AT CASTLE
HILL, JANET ROBINSON, and
MARGOT DOMINGO,

     Defendants-Respondents.

_____

            Argued November 1, 2023 – Decided April 23, 2024

            Before Judges Firko, Susswein, and Vanek.

            On appeal from the Superior Court of New Jersey, Law
            Division, Passaic County, Docket No. L-1705-19.

            Mark A. Mulick argued the cause for appellant.

            Stuart A. Weinberger (Weinberger & Weinberger,
            LLP) argued the cause for respondent.

   The opinion of the court was delivered by

FIRKO, J.A.D.

In this employment matter, plaintiff Brenda Azanedo appeals from a May 13, 2022 Law Division order dismissing her amended complaint against defendants Alaris Health at Castle Hill (Alaris), Janet Robinson, and Margot Domingo, on summary judgment. We affirm.

I.

Factual Background

We summarize the material facts from the summary judgment record, viewing them in the light most favorable to the non-moving plaintiff. See Richter v. Oakland Bd. of Educ., 246 N.J. 507, 515 (2021). Alaris is a nursing facility. In October 2018, plaintiff became employed at Alaris as a recreational therapist. Her responsibilities included initial assessment of the residents, providing their recreational activities, and assisting them with "their general requirements of life." At the time, Erica Corey was the Director of Recreation.

When she was hired, plaintiff signed a document detailing her responsibilities and acknowledged receipt of an employee handbook. Pertinent to this appeal, the handbook specifies that receiving a gift from a resident, using a cell phone in areas where patients are located, and taking pictures and videos of residents constitute grounds for immediate termination. The employee handbook also describes the procedure for reporting claims of discrimination

2

and harassment, and the process to investigate such claims. Alaris requires employees to report all allegations of abuse, neglect, or mistreatment of residents to management, and all such allegations will be investigated by Alaris. It was Alaris's policy to train all employees on anti-discrimination and harassment prior to their hire or on their first day of work. Plaintiff's personnel file indicates she received such training and signed the requisite form acknowledging the training.

Plaintiff observed residents—some suffering from dementia and Alzheimer's Disease—sitting in urine and feces for "hours at a time" without being taken to the bathroom and not having hot water bottles at their bed side. Plaintiff observed certified nursing assistants (CNAs) not properly feeding or cleaning residents; not cleaning up their vomit; and using vulgar language towards them. Plaintiff complained that mice were running around Alaris's premises.

In addition, plaintiff alleges CNAs falsified residents' shower records to indicate they had been showered when they had not been and failed to report when residents fell to their family members. She reported these incidents to Corey, Domingo, the senior administrator, and the head nurse "Colleen."[1]

---

[1] Colleen's surname is not contained in the record.

A-3129-21

Plaintiff claimed these incidents constituted violations under the law, citing

N.J.S.A. 30:13-1, N.J.S.A. 26:2H-1, and N.J.A.C. 8:34-1.18(7),[2] Alaris's own

---

[2] N.J.S.A. 30:13-1 provides: "The Legislature hereby finds and declares that the well-being of nursing home residents in the State of New Jersey requires a delineation of the responsibilities of nursing homes and a declaration of a bill of rights for such residents."

N.J.S.A. 26:2H-1 states the declaration of policy for hospital and related health care services:

> It is hereby declared to be the public policy of the State that hospital and related health care services and behavioral health care services of the highest quality, of demonstrated need, efficiently provided and accessible at a reasonable cost are of vital concern to the public health. It is further declared that integrating physical and behavioral health care is the most effective way to improve the health of individuals and the population at large. In order to provide for the protection and promotion of the health of the inhabitants of the State, the Department of Health (DOH) shall have the central responsibility for the development and administration of the State's policy with respect to health planning, hospital and related health care services and health care facility cost containment programs, behavioral health treatment and prevention programs, and all public and private institutions, whether State, county, municipal, incorporated or not incorporated, serving principally as residential health care facilities, nursing or maternity homes, or as facilities for the prevention, diagnosis, care, or treatment of human disease, mental illness, substance use disorder, pain, injury, deformity, or

4

policies, and the ethics of nursing home employee conduct. Plaintiff claims Alaris's administrators and supervisors took "no action or insufficient action" to correct the violations.

According to plaintiff, Colleen told her that she was "prohibited" from notifying the other Alaris supervisors or managers of any violations and should not file complaints with them. Following her report of the violations, plaintiff alleges Alaris's supervisors and co-employees retaliated against her. By way of example, plaintiff claims she would be left alone with up to ten residents with behavioral issues in the dayroom. On one occasion, plaintiff avers she attempted to conduct an activity with the residents, but CNAs and nurses discussed personal matters in her presence, often using loud, vulgar language. When plaintiff asked them to lower their voices, they would leave the room. Plaintiff was then "isolated" with the residents.

Plaintiff, who is "mixed race," also posits that often times when she came to work, Colleen would signal to the CNAs and nurses that plaintiff had arrived. The employees would leave the area, and sometimes shouted "the problem [is]

physical condition, shall be subject to the provisions of this act.

N.J.A.C. 8:34-1.18(7) is an incorrect cite and is non-existent.

here." The CNAs and nurses would state no newly hired employee—such as plaintiff—could "get rid of them" because they were long-time employees. Plaintiff also alleges the CNAs and nurses would not give the residents water, they told her assigned residents that she is a problem maker, and ridiculed the activities she participated in, such as playing dominos.

In December 2018 after a resident suffered a fall, plaintiff submitted a written report of the incident to Corey. Plaintiff claims the resident's family should have been notified of the fall "pursuant to regulation" but was not. Plaintiff personally notified the resident's family about the fall, and an investigation ensued by the DOH. According to plaintiff, Alaris employees told her to "lie" to the DOH investigators and not cooperate with the investigation. Plaintiff apparently acquiesced, and when the State investigator found no deficiencies, plaintiff felt "uncomfortable" because she was "ordered . . . to give insufficient information" to the investigator. Domingo testified that while all falls are investigated, not all of them are investigated by the DOH.

On April 4, 2019, Robinson replaced Corey as Director of Recreation and became plaintiff's supervisor. At a meeting, Robinson told plaintiff she was a "complainer." In addition, Robinson told plaintiff to "fix" her "attitude," she is

6

"negative," "hardheaded," "not a team player," and "I will never be able to tell you to do something and just have you say 'yes.'"

During the meeting, Robinson also instructed plaintiff to ask the residents if they were experiencing any problems. Plaintiff followed her instructions and reported back to Robinson that problems existed. Robinson then told Domingo that plaintiff tried to "coax" the residents to report problems that did not exist. Robinson "threatened" to change plaintiff's hours and the floor she was assigned to. Plaintiff claims Robinson "unjustifiably" wrote her up on several occasions resulting in unwarranted suspensions.

On April 5, 2019, plaintiff witnessed physical contact between Robinson and a fellow Alaris employee, Andrew Bruce, who was also supervised by Robinson. Plaintiff asserts Robinson approached Bruce, asked him if he was single, and had a conversation about when he would "take [] care of" stripping and waxing the floors in the recreation room. Bruce responded he was getting divorced, and the job would be completed over the weekend and take a few hours. According to plaintiff, Robinson hugged Bruce, placed his head between her breasts, and told him, "Call your wife and tell her you are not coming back." At his deposition, Bruce testified other Alaris employees had hugged him in the past.

7

On April 18, 2019, after an unrelated two-day suspension for her failure to provide timely activity programs and taking lunch at an inappropriate time, plaintiff complained about the Bruce/Robinson encounter to an Alaris human resources (HR) representative.[3] According to plaintiff, Bruce initially told her that he was shocked by Robinson's conduct and was pressured by her to sign an incident report that she created to get plaintiff to stop bothering him.

Alaris investigated the incident and prepared a report, which had inaccuracies later corrected through deposition testimony. For example, Bruce testified he was sitting down, and that Robinson did not put his face to her bosom; it was simply a "motherly" friendly hug. Plaintiff asserts she has a sexual harassment claim based on Robinson's conduct towards Bruce. Robinson testified she hugged Bruce because she was thankful that he promised to promptly complete the work. Robinson and Bruce denied the interaction was sexual in nature.

Bruce denied telling Robinson that he was getting divorced. Plaintiff told Robinson that her actions were the "equivalent of a man grabbing a women's head and putting it to his groin." After stating this, plaintiff claims she was

---

[3] Plaintiff claimed she immediately made a complaint to Robinson, however Robinson denied this claim at her deposition.

"written up." In conducting the investigation, Domingo found "no breach of policy," and concluded the hug had no sexual connotation and did not constitute sexual harassment. However, Bruce and Robinson were counseled about sexual discrimination and harassment.

Plaintiff also complained that she was called a "bitch" on almost a daily basis by her co-workers and supervisors. Plaintiff denied ever using the word "bitch" to refer to any Alaris employee while on duty. However, a resident and Bruce both confirmed plaintiff called Robinson a "bitch," and plaintiff later admitted to doing so at her deposition.

Additionally, plaintiff heard rumors that two Alaris employees were having sexual relations on Alaris's premises on more than four occasions. On one occasion, plaintiff "witnessed" the couple enter a resident's room and lock the door. Plaintiff felt sexually harassed by their conduct. Plaintiff reported this conduct to Domingo who advised she was aware of the conduct and did not take the matter seriously because the perpetrators were "young," and such conduct "was expected of them."

Plaintiff also alleges Rudy,[4] a kitchen worker, asked her why she was "trying to be black," which offended her. Plaintiff complained to Robinson

---

[4] Rudy's surname is not contained in the record.

about Rudy's comments, but nothing was done about it and the comments continued. After notifying management of "various illegal, unethical, [and] otherwise inappropriate conduct by Alaris employees," plaintiff claims her assigned parking spot was taken away from her.

In May 2019, a photograph of personnel in plaintiff's department was altered, and the Muppet character "Ms. Piggy" circulated throughout Alaris with plaintiff's face superimposed on it. Plaintiff claims Robinson told the employees not to inform her of the altered photograph. Plaintiff maintains Robinson ordered the employees in plaintiff's department to view the altered photograph before she deleted it. Plaintiff asserts Domingo queried whether plaintiff sided with the residents or Alaris, which Domingo denied at her deposition. In plaintiff's view, she was ostracized by co-workers, locked in a dayroom, the only employee not allowed in the building prior to her shift, and was not promoted.

Prior to her termination, plaintiff overheard Domingo instruct Alaris supervisors and co-workers to concoct a reason to fire her. In total, plaintiff was disciplined eight times following her report of Robinson's hugging incident with Bruce. Robinson or Domingo originated or authorized seven out of the eight disciplinary notices.

A-3129-21

Robinson expressed that plaintiff persistently made false statements, caused havoc, and did not follow instructions. Plaintiff was disciplined for not providing timely activity programs and for taking lunch at an inappropriate time. Plaintiff was suspended for two days after a scheduled mandatory meeting during her lunch hour interfered with another appointment she had in preparation for Easter Sunday. Plaintiff did not return to work that day despite instructions to do so. She was scheduled to hold Bingo for the residents later in the day. Plaintiff also received a written discipline for being in the dayroom with her feet up on a chair and eating while a nearby resident was falling out of her wheelchair.

The next day, Janine Dicalagaro wrote a report stating a resident heard plaintiff call Robinson a "bitch." Bruce also confirmed plaintiff called Robinson a "bitch" and how she would attempt to "get this bitch [Robinson] in trouble". On May 13, 2019, plaintiff was again disciplined regarding an alleged prank in violation of the handbook. Plaintiff was accused of either spitting in or replacing the contents of a co-worker's water bottle with tap water, which distressed the co-worker. Plaintiff denied the incident took place and Domingo would not let her read the write-up.

11

In May, plaintiff, without approval, took off on her birthday, did not come to work as scheduled, and caused a confrontation regarding cutting a cake, resulting in another written discipline. Plaintiff was given training at that point regarding how to properly process requests for time-off. On May 28, 2019, Domingo wrote plaintiff up because she said "hello" to a resident during a Memorial Day service, but plaintiff averred Domingo "disingenuously informed plaintiff" the write-up was for interrupting a "religious" ceremony. Plaintiff was further disciplined for promoting a hostile environment within her department and arguing with Robinson.

On June 14, 2019, plaintiff was issued a disciplinary notice for discussing another staff member with a resident, resulting in a two-day suspension. At a meeting with Domingo, plaintiff was admonished for prompting residents to say negative things about their care. Plaintiff does not recall when these meetings occurred or when she made the first complaint and later complaints concerning resident care, who they were made to, or what the complaints were. None of plaintiff's complaints were made in writing. Domingo, who was no longer employed by Alaris at the time of her deposition, testified that all of plaintiff's complaints—formal or informal—were investigated, and all of them were

deemed unfounded. Domingo also testified that she did not think Robinson was "retaliating" against plaintiff.

Co-workers complained about working with plaintiff. A therapist, Jared Alfonzo, wrote an incident report dated July 1, 2019, stating staff and residents felt uncomfortable around plaintiff. CNAs were upset their actions were misrepresented by plaintiff, resulting in confrontations. For example, plaintiff complained a CNA was not toileting a resident, but an investigation revealed the resident was "bone dry."

Ultimately, plaintiff was terminated in July 2019 for accepting gratuities—including a purse—from a resident in January 2019 contrary to Alaris's policy. The policy forbids employees from accepting gratuities, as stated in the employee handbook, which plaintiff acknowledged she received and had training on. A resident witnessed the purse incident. A housekeeper also witnessed the resident gifting the purse to plaintiff, who denied ever accepting or seeing the purse. According to plaintiff, the housekeeper falsified the purse incident because she was accepting gifts from residents.

Plaintiff claims the "gratuities" were in the form of "food," i.e. "lunch purchases" from a resident she was assisting, and she immediately informed her supervisors about it. The lunch purchases ceased thereafter. No investigation

was conducted regarding the lunch purchases, which plaintiff claims were used as a "pretext" for her termination. Plaintiff did not recall the number of meetings or conversations she had with Domingo about the purse incident even though plaintiff recorded some of the meetings. Plaintiff believed the supervisors and employees at Alaris were trying to get rid of her.

The Litigation

On May 30, 2019, plaintiff filed a complaint in the Law Division alleging violations of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14 (count one); and the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50 (count two); and the common law, while she was still employed by Alaris. On July 31, 2020, after being terminated, plaintiff filed a first amended complaint, which included a third count for wrongful termination, in violation of CEPA, the LAD, and the common law. Plaintiff sought compensatory damages under CEPA, the LAD, and the common law, past, present, and future wages, damages for emotional distress, and attorney's fees.

Following a period of discovery, defendants moved for summary judgment seeking dismissal of the first amended complaint in its entirety, which plaintiff opposed. Defendants argued that plaintiff failed to establish the factors

required to find a violation under CEPA, the LAD, or the common law, and the adverse actions, such as disciplinary warnings and termination, have no causal connection to any violations of CEPA, the LAD, or the common law. Rather, defendants contended that the actions taken by them against plaintiff were based entirely on her misconduct as evidenced by the seven written warnings and multiple suspensions in her ten-month period of employment. According to defendants, the actions taken against plaintiff were based on facts presented from a diverse group of Alaris employees, many of them had no connection to the purported violations alleged by plaintiff and undisputed facts presented by residents.

In her statement of undisputed facts under Rule 4:46-2(a), plaintiff claimed Domingo wrote her up every time she complained about the incidents described. Plaintiff alleged her complaints involving the residents' care were not investigated because she "was instructed to stop complaining." Plaintiff is "mixed race" and found the racial comments "to be embarrassing." Therefore, she did not report them to anyone. Over time, plaintiff was "very careful and scared" about what she reported because the repercussions became "worse."

Plaintiff stated she was locked in a dayroom on multiple occasions by an unidentified person and called a "bitch" every time she went upstairs. Robinson

instructed plaintiff to report to her if CNAs were not in the dayroom with her. Plaintiff claimed Colleen "shadowed her" every time plaintiff entered a resident's room. Plaintiff asserted she was "frequently yelled at and told how horrible she was and that people didn't like her." Following a memorial service one day, an incident occurred that plaintiff stated caused her to go home crying. Plaintiff alleged defendants' employees made her life "impossible," and she was "bullied every day." Plaintiff stated she was never trained in Alaris's anti-discrimination/harassment policies.

On May 13, 2022, the trial court conducted oral argument on defendant's motion for summary judgment and issued a twenty-three-page statement of reasons that day granting the motion. The trial court explained that the motion record failed to create a genuine issue of material fact as to whether plaintiff engaged in CEPA-protected conduct.

The trial court reasoned that plaintiff attempted to allege violations of New Jersey law governing "senior institutions," such as residents sitting in urine and feces for extended periods of time; failure to properly feed, shower, and clean them; failure to notify a resident's family about a fall and falsifying information to the DOH, but concluded she is "unable to carry her burden of specific instances of complaints made" within the meaning of CEPA.

16

Relying on Chiofalo v. State, 238 N.J. 527, 540, 543 (2019), the trial court concluded "[t]he problem is that [p]laintiff continually and consistently did not recall when, or to whom, any of the above assertions were made throughout her deposition testimony," notwithstanding the fact that plaintiff "did record conversations between herself and her co-workers." The trial court noted the audio recordings were not provided to the court. The trial court emphasized "there is no connection to a possible timeframe other than with [plaintiff's] employment." The trial court reasoned plaintiff "cannot recall the complaints, when they were made, or to whom," which are "critical in the CEPA analysis because if she made them to co-workers instead of supervisors, CEPA would not apply."

Further, despite the pattern of disciplinary action and termination, the trial court emphasized that plaintiff failed to establish a "prima facie even indirect connection between the allegations and CEPA protections." The trial court noted plaintiff "could not pin" the Robinson/Bruce incident down to a specific point in April, which is important because plaintiff reported the incident "after her disciplinary suspension" and "several disciplinary infractions."

The trial court stated plaintiff could not even recall "the reason" when she made the complaints, which may have supported the "temporal nexus" she raised

in opposition to the motion. The trial court also held it was unclear in plaintiff's opposition as to how many resident reports of plaintiff's alleged misconduct were retaliatory in nature.

On the issue of pretext, the trial court addressed the burden shifting analysis request under Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 551 (App. Div. 1995). The trial court noted "plaintiff has the ultimate burden to prove that the proffered reasons for the discriminatory action or adverse action taken by the employer are mere pretext." Ibid. The trial court concluded "[p]laintiff fails to provide a weakness, implausibility, inconsistency, incoherency, or contradiction that would lead a factfinder to be able to find in [p]laintiff's favor."

The trial court found the "purse allegation" standing alone would lead to plaintiff's "firing" under Alaris's rules. The trial court observed plaintiff's allegations that her termination was improper because she did not see the purse, she was unaware of the accusation until her termination, and previous disciplinary notices received by her were "frivolous" and show a "scramble" for a reason to terminate her lacked any evidential support. The trial court found plaintiff's assertions regarding the purse incident were "conjecture" and "speculation."

The trial court also dismissed plaintiff's hostile work environment claims noting she contributed to the alleged hostile work environment "as a perpetuator of the alleged culture at Alaris." With respect to the Robinson/Bruce incident, the trial court found nothing in the record to suggest "the hug was severe or pervasive enough to alter [p]laintiff's workplace," and it never occurred again.

The rumors of sexual activity were unsubstantiated according to the trial court and not actionable. The trial court found plaintiff being called a "bitch" did not create a hostile work environment under the LAD because she engaged in the same "offensive and inappropriate conduct." The trial court noted plaintiff's accusations regarding Rudy's comments about her race were not reported to Alaris, Domingo, or Robinson, and they did not become aware of the claim until the lawsuit was filed.

The trial court also concluded the record was devoid of any evidence that plaintiff was terminated because of her race or sex and dismissed the disparate treatment claim with prejudice. Because plaintiff did not oppose defendants' motion to dismiss her common law, vicarious liability, and after-acquired evidence claims, those claims were dismissed with prejudice. This appeal followed.

Plaintiff presents the following arguments for our consideration:

(1) the court erred in making credibility determinations against her in granting summary judgment;

(2) the court erred in dismissing her LAD hostile work environment claim when her supervisors and co-employers referred to her on a daily basis as a "bitch," and plaintiff denied using that word in reference to her co-employees and supervisors;

(3) the court erred in dismissing her CEPA and LAD retaliation claims;

(4) the court improperly dismissed her LAD disparate treatment and common law causes of action for wrongful termination and intentional infliction of emotional distress, which were not challenged by defendants;

(5) the court erred in its analysis of an employer's responsibility for the discriminating conduct of its employees.

## II.

Our review of a trial court's grant or denial of a motion for summary judgment is de novo. Samolyk v. Berthe, 251 N.J. 73, 78 (2022) (citing Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019)). We "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party . . . are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm. Inc., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540). "Conclusory and self-serving assertions . . . are insufficient to overcome the motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co. 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Plaintiff first asserts the court made impermissible credibility determinations by (1) relying on Bruce's testimony and statements, (2) finding the reason for her termination was accepting a gift from a resident, (3) ignoring the fact that plaintiff denied ever using the word "bitch" in reference to co-employees or supervisors, (4) giving no weight to Robinson and Bruce using the phrase "motherly hug," and (5) ignoring plaintiff's statement that some of her harassers were Alaris supervisory staff, and she complained on numerous occasions to supervisors and an HR representative in determining defendants were not negligent because they were not aware of certain LAD and CEPA complaints. We address each of plaintiff's causes of action in turn.

LAD

To establish a claim of hostile environment discrimination under the LAD, a plaintiff "must show that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." Griffin v. City of E. Orange, 225 N.J. 400, 413-14 (2016) (quoting Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993)). Our review of a hostile work environment claim requires consideration of "the totality of the circumstances." El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 178 (App. Div. 2005).

Under the first prong of a hostile work environment claim, "a plaintiff must show by a preponderance of the evidence that the impermissible conduct would not have occurred but for plaintiff's protected status." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24 (2002). Under the second prong, "[i]t is the harasser's conduct, not . . . plaintiff's injury, that must be severe or pervasive." Lehmann, 132 N.J. at 610.

To determine the severity or pervasiveness of conduct, courts must make an assessment of the circumstances which involves (1) "the frequency of all the

discriminatory conduct," (2) "its severity," (3) "whether it is physically threatening or humiliating, or a mere offensive utterance," and (4) "whether it unreasonably interferes with an employee's work performance." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196 (2008) (quoting Green v. Jersey City Bd. of Educ., 177 N.J. 434, 447 (2003)).[5] The Court stated "[n]either rudeness nor lack of sensitivity alone constitutes harassment, and simple teasing, offhand comments, and isolated incidents do not constitute discriminatory changes in the terms and conditions of one's employment." Shepherd, 174 N.J. at 25-26.

Our Supreme Court has observed "one incident of harassing conduct can create a hostile work environment." Taylor v. Metzger, 152 N.J. 490, 499 (1998). However, our Court has further explained that, although it

> "is certainly possible" . . . a single incident, if severe
> enough, can establish a prima facie case of a hostile

---

[5] Plaintiff argues that Cutler v. Dorn, 196 N.J. 419 (2008), overruled Heitzman v. Monmouth County, 321 N.J. Super. 133 (App. Div. 1999). But, as the trial court aptly noted, this is incorrect. Heitzman was partially overruled. The portion that was overruled only applied to a heightened threshold for religious claims under the LAD. Cutler, 196 N.J. at 440 ("If the holding in Heitzman is perceived, in application, to suggest a different, and higher, threshold for demonstrating a hostile work environment when religion-based harassment is claimed, then that misapprehension must end."). The standard for all other claims did not change. Moreover, plaintiff cites to the dissent in Heitzman as binding law. However, a dissent is not binding law and has merely persuasive value.

work environment, "it will be a rare and extreme case in which a single incident will be so severe that it would, from the perspective of a reasonable [person situated as the claimant], make the working environment hostile."

[Id. at 500 (quoting Lehmann, 132 N.J. at 606-07).]

Under the third and fourth prongs of the standard for establishing an actionable hostile environment under the LAD, the Court has employed "an objective standard to exclude an 'idiosyncratic response of a hypersensitive plaintiff.'" Shepherd, 174 N.J. at 26 (quoting Lehmann, 132 N.J. at 614). "Settled case law relies on an objective standard to evaluate a hostile environment claim." Rios, 247 N.J. at 12. In assessing a hostile environment claim, the focus "is on the harassing conduct itself and 'not its effect on the plaintiff or on the work environment.'" Ibid. (quoting Cutler, 196 N.J. at 431).

Plaintiff claims a hostile work environment based on sex was created when she was repeatedly called a "bitch" on almost a daily basis by supervisors and coworkers in the presence of employees and residents, and by the alleged sexual activity at Alaris—from the "motherly hug" between Robinson and Bruce, to the suspicion of intercourse between employees behind a closed, locked door. The trial court determined these instances did not create a hostile work environment based on sex, because: (1) plaintiff engaged in the same name

calling, (2) there was no evidence the hug was inappropriate, and (3) plaintiff did not witness employees actually engaging in intercourse.

Plaintiff also avers that other circumstances contributing to the hostility of her work environment were not considered, such as: (1) being locked in a dayroom by coworkers, (2) not being allowed to enter the building when other employees were allowed to enter, (3) overhearing Domingo instruct another supervisor to concoct a reason to fire her, (4) her parking space was taken away, (5) her face was superimposed on the "Ms. Piggy" character, which was circulated throughout the facility, and (6) she lost a promotion. We are unpersuaded.

"A hostile work environment discrimination claim cannot be established by epithets or comments which are 'merely offensive." Mandel v. UBS/Paine Webber, Inc., 373 N.J. Super. 55, 73 (App. Div. 2004) (quoting Heitzman, 321 N.J. Super. at 147). In Mandel v. UBS/Paine Webber, Inc., the plaintiffs sued for hostile work environment created by Jewish epithets and being called a "bitch." Id. at 68 (referring to plaintiff as "something like a Jew bitch" to someone else when plaintiff was not present). Our Court found the "hostile work environment claims were properly dismissed because even considering the facts in a light most favorable to plaintiffs, a jury could not conclude that [the]

comments and actions were so severe or pervasive to create a hostile work environment."

Similarly, in Heitzman, a plaintiff claimed a hostile work environment was created by comments involving plaintiff's Jewish background. Heitzman, 321 N.J. Super. at 148 (involving comments made directly to plaintiff about Friday night dietary habits, vacationing in the "Jewish Alps," characterizing yarmulkes as "skullcaps," and comments directed at other persons like "Jew bitch" and "Jewish mile"). Because the comments were sporadic, casual, and "did not involve any physical threat or humiliation or any direct interference with plaintiff's work performance," we concluded the offensive comments were not severe enough to create a hostile work environment. Ibid.

After examining the record on appeal, and considering the proofs as a whole, whether plaintiff was called a "bitch" on a "daily" basis or whether she ever reported these allegations to defendants there is no evidence of any physical threats to satisfy prong two. Furthermore, we observe that plaintiff admitted at her deposition that she referred to certain Alaris employees as "bitch" during the course of her employment, including Robinson, which further negates plaintiff's argument on appeal. Moreover, on April 19, 2019, Dicalagaro wrote a report stating that a resident heard plaintiff call Robinson a "bitch." And, on April 18,

2019, Bruce also confirmed that plaintiff called Robinson a "bitch" and stated she would "get even" with her.

As the trial court correctly pointed out, plaintiff was "a perpetrator of the alleged culture at Alaris," while simultaneously claiming she was subjected to a hostile work environment by other Alaris employees using the same word—bitch—against her. We conclude based upon our de novo review that plaintiff's sex based hostile work environment claim was properly dismissed, and the trial court did not make inappropriate credibility determinations but relied upon substantial credible evidence in the record including plaintiff's own deposition testimony.

Regarding the hug between Bruce and Robinson, plaintiff failed to present any evidence that but for her status as a female, the hug—which did not involve her—would not have occurred. Saliently, Bruce signed an incident report, but at his deposition, he testified plaintiff told him, "Andrew, I need your help; I want to get this bitch [Robinson] in trouble" and the hug was in appreciation for "doing the floors." Bruce also testified that plaintiff got on his "nerves," and he went along with signing the incident form "just so she (plaintiff) can get off my back."

The hug had nothing to do with plaintiff's female status and was properly dismissed.  See Lehmann, 132 N.J. at 601 ("Hostile work environment sexual harassment . . . occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment became hostile.").

Like the hug, the alleged sexual activity amongst coworkers at Alaris lacked sufficient evidence and did not involve plaintiff.  Thus, plaintiff cannot establish that the purported sexual activity amongst other coworkers would not have happened but for her gender or was hostile.  Ibid.

The "Ms. Piggy" incident in our view was bad behavior but does not establish a hostile work environment based on gender.  This was an "isolated incident" and is analogous to the "simple teasing" remarks in Heitzman, and not actionable.

Plaintiff also claims that a hostile work environment based on race was created when Rudy, a kitchen worker, asked her why she was "trying to be black."  Under the LAD, the elements of a hostile work environment claim based on race are the "conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [African American] believe that (4) the conditions of employment

28                                                          A-3129-21

are altered, and the working environment is hostile or abusive." Taylor, 152 N.J. at 498. Although plaintiff satisfies prong one, she fails to establish prongs two, three, and four, which are required to prove a hostile work environment claim.

"The severity of a remark can be 'exacerbated' when it is uttered by a supervisor." Rios, 247 N.J. at 11-12 (quoting Taylor, 152 N.J. at 503). Furthermore, "harassment by a supervisor can have a greater impact than misconduct by fellow employees." Taylor, 152 N.J. at 504.

Here, Rudy was only a fellow employee, not a supervisor, which makes his remark less "severe." Ibid. And, this was a one-time event. Our Court has found invidious epithets, rather than referring to a person as "black," reaches the requisite level of severity. E.g., id. at 513 (finding a sheriff's use of the term "jungle bunny" in reference to an officer was extreme and outrageous).

Here, because Rudy did not use an epithet, this was an isolated incident, and he was not a supervisor, his remark was not severe enough to be actionable. Moreover, defendants were not informed about Rudy's comment until after plaintiff instituted suit. Furthermore, Rudy was employed by an entirely different department than plaintiff. Therefore, based on our de novo review,

plaintiff's claim for hostile work environment based on race was properly dismissed.

CEPA

CEPA was enacted "to provide 'broad protections against employer retaliat[ion]' for workers whose whistle-blowing actions benefit the health, safety and welfare of the public." Carmona v. Resorts Int'l Hotel, 189 N.J. 354, 371 (2007) (quoting Feldman v. Hunterdon Radiological Assocs., 187 N.J. 228, 239 (2006)). Its purpose is "to protect whistle[-]blowers from retaliation by employers." Lippman v. Ethicon, Inc., 222 N.J. 362, 378 (2015). Consistent with that purpose, CEPA "is considered remedial legislation entitled to liberal construction." Ibid.

A plaintiff establishing a prima facie claim for retaliation under CEPA must demonstrate:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle[-]blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Id. at 380 (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003))].

30

Here, the parties agree that plaintiff's CEPA retaliation claim is based on N.J.S.A. 34:19-3(c), which bars an employee from taking any retaliatory action against an employee when the employee objects to, or refuses to participate in any activity, policy, or practice and reasonably believes:

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

See also Allen v. Cape May Cnty., 246 N.J. 275, 290 (2021) (quoting N.J.S.A. 34:19-3(c)). When a plaintiff establishes a prima facie claim under CEPA, the burden of persuasion shifts to the defendant-employer "to rebut the presumption of discrimination by articulating some legitimate nondiscriminatory reason for

31

the adverse employment action." Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999); see also Allen, 246 N.J. at 290-91. If the employer meets that burden, the plaintiff then must prove the employer's asserted legitimate reasons were pretextual and not the real reasons for the employer's discriminatory acts. Allen, 246 N.J. at 291.

## Prong One

To satisfy the first prong of CEPA, a plaintiff must prove that he or she reasonably believed the conduct at issue was against a law under N.J.S.A. 34:19-3(a)(1) or was incompatible with a "clear mandate of public policy" under N.J.S.A. 34:19-3(c)(3). Estate of Roach v. TRW, Inc., 164 N.J. 598, 611 (2000). Plaintiff satisfies prong one, because giving her the benefit of all reasonable inferences that the complaints she made about the nursing home's shortcomings, she reasonably believed the issues were violations of law or public policy.

## Prong Two

Under prong two, a "whistle-blowing" activity "refers to notification, or threatened notification, to an outside agency or supervisor . . . and also permits a claim to be supported by evidence that the employee objected to or refused to participate in the employer's conduct." Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 106 (2008). The whistle-blowing activity must reflect a "threat of

32

public harm, not merely a private harm or harm only to the aggrieved employee." Maw v. Advanced Clinical Commc'n, Inc., 179 N.J. 439, 445 (2004). "Vague and conclusory complaints, complaints about trivial or minor matters, or generalized workplace unhappiness are not the sort of things that the Legislature intended to be protected by CEPA." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 529-31. 546 (2013).

CEPA's goal is "not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-94 (1998). Accordingly, it is not plaintiffs' "burden to show that the defendant actually violated the law, rule, regulation, or other authority cited, but only to demonstrate that he or she held a reasonable belief that such a violation occurred." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 30 (2014).

Further, plaintiffs need not present evidence that the employer's conduct was actually unlawful, rather a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred. Dzwonar, 177 N.J. at 462. The trial court must then "make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public

33

policy identified by the court or the plaintiff."  Id. at 464.  If a nexus can be established, it is a question of fact for the jury to "determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable."  Ibid.

Our Supreme Court has recognized that in the context of a CEPA claim, "a 'clear mandate' of public policy suggests an analog to a constitutional provision, statute, and rule or regulation promulgated pursuant to law such that . . . there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct."  Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 444 (2004) (Emphasis in original). .  A "vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate."  MacDougall v. Weichert, 144 N.J. 380, 392 (1996); see also id. at 391 (a plaintiff must identify a violation of a public policy that is "clearly identified and firmly grounded").

Further, an employee who argues under N.J.S.A. 34:19-3(c)(3) "must make the additional showing that the 'clear mandate of public policy' he or she reasonably believes the employer's [conduct] to be incompatible with is one that 'concern[s] the public health, safety or welfare or protection of the

environment.'" Maimone v. City of Atl. City, 188 N.J. 221, 231 (2006) (quoting Estate of Roach, 164 N.J. at 609-11).

In addition, any "determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law" for the court. Mehlman, 153 N.J. at 187. The sources of public policy that a court may rely upon "include legislation; administrative rules, regulations or decisions; and judicial decisions." Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72 (1980).

Plaintiff argues she was retaliated against for her whistle-blowing activity involving Alaris, which she claimed entailed violations of N.J.S.A. 30:13-1, 26:2H-1, and N.J.A.C. 8:34-1.18(7), as follows: (1) residents sitting in urine and feces for extended periods of time, (2) failure to properly feed residents, (3) failure to shower residents, (4) failure to clean vomit from residents, (5) staff using vulgar language towards residents, (6) failure to report falls, (7) failure to notify a resident's family about a fall, and (8) falsifying information to DOH. Plaintiff also raised other issues, such as a potential fire hazard from her being locked in the dayroom on multiple occasions, and employees having sex on Alaris's premises or engaging in sexual harassment.

Applying this authority, we are satisfied that plaintiff failed to present sufficient evidence to meet the second prong of the CEPA test. As the trial court noted, plaintiff "is unable to carry her burden of specific instances of complaints made." At her deposition, plaintiff only testified that she made complaints while employed at Alaris, but she could not "recall the complaints, when they were made, or to whom." Moreover, plaintiff could not recall who she made the complaints to, which as the trial court astutely found, is "critical in the CEPA analysis because if she made them to co-workers instead of supervisors, CEPA would not apply."

On appeal, plaintiff contends her inability to provide any details about her complaints at her deposition should be disregarded because she provided the information in her answers to interrogatories. We are unpersuaded. Plaintiff's lack of specificity is fatal to the requirement under prong two that she proffer a prima facie showing of a complaint falling within the CEPA statute. Plaintiff has pointed to nothing else in the record to support her claim and failed to establish a prima facie case under CEPA prong two.

### Prong Three

The third CEPA prong requires a plaintiff to demonstrate that "an adverse employment action was taken against . . . h[im]" by defendant. Lippman, 222

N.J. at 380. Under N.J.S.A. 34:19-2(e), "retaliatory action" is defined as "the discharge, suspension or demotion of any employee, or other adverse employment action taken against an employee in the terms and conditions of employment." "What constitutes an 'adverse employment action' must be viewed in light of the broad remedial purpose of CEPA, and [a court's] charge to liberally construe the statute to deter workplace reprisals against an employee speaking out against a company's illicit or unethical activities." Donelson v. DuPont Chambers Works, 206 N.J. 243, 257-58 (2011).

An adverse employment action can include "making false accusations of misconduct, giving negative performance reviews, issuing an unwarranted suspension, and requiring pretextual mental-health evaluations—causing the employee to suffer a mental breakdown and rendering him [or her] unfit for continued employment." Id. at 258. Additionally, retaliation can be "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Green, 177 N.J. at 448.

Here, we are satisfied that plaintiff presented sufficient evidence to satisfy the third prong under Lippman because she faced disciplinary action and was ultimately terminated. These are adverse employment actions.

To satisfy the fourth prong of the CEPA test, plaintiffs must demonstrate that "a causal connection exists between the whistle-blowing activity and the adverse employment action." Lippman, 222 N.J. at 380. A causal connection "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action." Maimone, 188 N.J. at 237 (citing Estate of Roach, 164 N.J. at 612). Therefore, the plaintiff does not need to show a "direct causal link" between the whistle-blowing activity and the retaliation. Battaglia, 214 N.J. at 558. "The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection." Maimone, 188 N.J. at 237; Estate of Roach, 164 N.J. at 612.

Based upon our de novo review of the record, we conclude that plaintiff failed to present sufficient evidence to meet the requirements of the fourth prong in order to defeat summary judgment. Plaintiff could not, for example, pinpoint the date in April 2019 when the Robinson and Bruce hugging incident occurred. However, defendants presented undisputed evidence the hug took place on April 5, and that plaintiff did not complain about the hug until after her disciplinary suspension and disciplinary infractions occurred. The timeline is critical, and

plaintiff could not even recall the "season" in which she made the complaints, as the trial court observed.

Therefore, plaintiff did not establish a "temporal nexus" between her whistle-blowing activity and the adverse employment action. Lippman, 222 N.J. at 380. We also note that it is undisputed that several residents reported plaintiff's misconduct, and there is nothing in the record to suggest that Alaris's employees joined in the residents' reports to conspire against plaintiff. Thus, plaintiff failed to meet her burden under prong four.

Retaliation Under the LAD

The LAD's overarching goal is to eradicate discrimination, and our Court has "recognized and given effect to [its] broad remedial purposes." Battaglia, 214 N.J. at 546 (2013). The LAD declares that "it is an unlawful employment practice 'to take reprisals against any person because that person has opposed any practices or acts forbidden under this Act.'" Tartaglia, 197 N.J. at 125 (quoting N.J.S.A. 10:5-12(d)).

To establish a retaliation claim under the LAD, N.J.S.A. 10:5-12(d), a plaintiff must "demonstrate that: (1) they engaged in a protected activity known by the employer; (2) thereafter the employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation." Rios

v. Meadowlands Hospital Medical Center, 463 N.J. Super. 280, 287 (App. Div. 2020) (quoting Tartaglia, 197 N.J. at 125). As a prerequisite, a plaintiff must establish "that the alleged action triggering the retaliation was taken on a good faith and reasonable basis." Id. at 290 (discussing Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 372-73 (2007)). "All LAD claims are evaluated in accordance with the United States Supreme Court's burden shifting mechanism." Battaglia, 214 N.J. at 546 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)).

Construing the facts from plaintiff's answers to interrogatories in a light most favorable to her, Domingo had knowledge of whistle-blowing activity because plaintiff reported some of Alaris's nursing home shortcomings to her. Robinson was responsible for disciplining plaintiff and knew of plaintiff's complaint involving her and Bruce.

After examining the record on appeal, we are satisfied that defendants proved the reasons motivating adverse actions against plaintiff were legitimate and not pretextual. The disciplinary actions—ranging from warning to suspension—for: (1) failing to provide timely activity programs; (2) taking lunch at inappropriate times; (3) returning to work late after attending a meeting and neglecting to notify about her anticipated tardiness; (4) being in the dayroom

with her feet up on a chair while a resident was failing out of her wheelchair; (5) taking time off in violation of company policy; (6) interrupting a memorial service; (7) improperly discussing a staff member with a resident; (8) sticking her tongue out at a resident; and (9) accepting a purse as a gift from a resident, which is expressly prohibited in the employee handbook, justified her termination. Moreover, the record shows plaintiff was consistently a less than exemplary employee at Alaris, as evidenced by the disciplinary actions leading up to her termination. Defendants advanced legitimate reasons for discharging plaintiff. Kolb, 320 N.J. Super. at 479. The trial court's finding is supported by the record, and based upon our de novo review, we discern no error.

III.

Plaintiff next asserts that the trial court improperly dismissed her disparate treatment and common law causes of action because defendants never challenged those causes of action. She also contends that the trial court ignored her testimony that plaintiff overheard Domingo saying to find a reason to get rid of her, and the disciplinary actions taken after reporting the hug between Robinson and Bruce.

A prima facie case for disparate treatment is made when a member of "a protected group is shown to have been singled out and treated less favorably

41

than others similarly situated on the basis of an impermissible criterion" under anti-discrimination laws. Mandel, 373 N.J. Super. at 74 (quoting EEOC v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990)). A plaintiff just needs to show that it was "more likely than not" that the employer based its actions on unlawful considerations. Id. at 75. "The same burden shifting methodology is employed for disparate treatment claims as for hostile work environment." Ibid. At summary judgment, "the judge must determine whether a plaintiff alleging disparate treatment has produced sufficient evidence to rebut the employer's alleged legitimate reason for its adverse action." Ibid.

Plaintiff claimed to have overheard a plot to concoct a reason to get rid of her, which she alleges was a pretext for her discharge. But this was insufficient to sustain a disparate treatment claim because the legitimate reason prompting termination was that she accepted a gift from a resident in clear violation of Alaris's policy. Because we conclude there was a legitimate reason for terminating plaintiff that she failed to rebut with evidence of pretext, i.e., discriminatory intent, she failed to show that defendants more likely than not used an impermissible criterion. See Viscik v. Fowler Equip. Co., 173 N.J. 1, 14 (2002) ("To prove pretext . . . [a plaintiff] must also demonstrate that the employer was motivated by discriminatory intent."); see, e.g., Mandel, 373 N.J.

Super. at 76 (finding plaintiff failed to show discriminatory intent because there was no evidence that Jewish brokers were treated less favorably than other brokers). Therefore, it was proper to dismiss plaintiff's disparate treatment claim.

Likewise, it was appropriate to dismiss plaintiff's common law claims. Wrongful termination was properly dismissed because plaintiff was an at-will employee. See Bernard v. IMI Sys., Inc., 131 N.J. 91, 104-06 (1993) (explaining private employment is presumed to be at will and such an employee may be discharged with or without cause). And intentional infliction of emotional distress was properly dismissed because there is no evidence of extreme and outrageous conduct in the record. See Tarr v. Ciasuilli, 181 N.J. 70, 77 (2004) (enumerating intentional infliction of emotional distress elements as (1) intentional and (2) outrageous conduct by the defendant, (3) proximate cause, and (4) distress that is severe; requiring the emotional distress be "so severe that no reasonable [person] could be expected to endure it").

IV.

Finally, plaintiff asserts the trial court erred by failing to analyze the vicarious liability of Alaris's knowledge of its employees' discriminatory conduct and its failure to rectify it. Because we find the amended complaint was

properly dismissed on summary judgment, we need not address whether vicarious liability applies here.

To the extent we have not specifically addressed any of plaintiff's arguments, it is because we have considered those contentions of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION